Filed 4/2/21  P. v. Polino CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOSE ANTONIO POLINO,<br><br>Defendant and Appellant. | F077606<br><br>(Super. Ct. No. F16902212)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Kristi Culver Kapetan, Judge.

Randy S. Kravis, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Matthew Rodriguez, Acting Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Daniel B. Bernstein, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury convicted Jose Antonio Polino (defendant) of committing sex crimes against two children.  His appeal concerns an allegation of gender discrimination during the jury selection process.  There are additional claims of ineffective assistance of counsel, instructional error, and sentencing error under Penal Code section 654.

(Undesignated statutory references are to the Penal Code.)  We will modify the judgment to stay imposition of punishment on two counts and affirm the judgment as modified.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant was accused of molesting his stepdaughter (victim 1) and stepgranddaughter (victim 2) multiple times between November 2007 and March 2011. Defendant was between the ages of 29 and 32 years old during that time period.  Victim 1 was between the ages of six and eight on the dates relevant to her.  Victim 2 was between the ages of nine and 11 on the dates relevant to her.

An information filed by the Fresno County District Attorney charged defendant with 13 criminal counts.  The charges involving victim 1 alleged lewd acts upon a child under the age of 14 in violation of section 288, subdivision (a) (counts 1–2), and sexual acts with a child under the age of 11 in violation of section 288.7, subdivision (b) (counts 3–6).  The charges involving victim 2 also alleged violations of sections 288, subdivision (a) (counts 7–11), and 288.7, subdivision (b) (counts 12–13).  A multiple victim allegation was pleaded in relation to counts 1, 2, 7, 8, 9, 10, and 11.  (§ 667.61, subd. (e)(4).)

The case went to trial in April 2018.  During jury selection, defendant made two unsuccessful motions based on *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).  Only the second motion, which alleged gender discrimination, is at issue in this appeal.  Background information on the *Batson*/*Wheeler* claim is provided in the Discussion, *post*.

The People's case-in-chief included testimony from the victims and their mothers, two police officers who had investigated the allegations, and an expert on child sexual abuse accommodation syndrome (CSAAS).  The defense case consisted of testimony by defendant and three character witnesses.  The claims on appeal do not require a detailed summary of the trial evidence.  Where relevant to a specific claim, additional background is provided in the body of this opinion.

2.

Defendant was found guilty on all counts involving victim 2. For the charges involving victim 1, defendant was convicted on counts 1, 2, and 5, and acquitted on counts 3, 4, and 6. The multiple victim allegation was found true. He was sentenced to an aggregate prison term of 150 years to life.

## DISCUSSION

### I. Batson/Wheeler Claim

#### A. Background

Jury selection began with 113 prospective jurors. The trial court excused 32 people for hardship reasons. The remaining 81 members of the venire consisted of 37 men and 44 women. The prospective jurors completed questionnaires asking about their age and gender, educational, occupational, and criminal history, their proficiency with the English language, and their potential biases.

Eighteen people were selected to participate in the first round of voir dire. The gender breakdown was eight men and 10 women. Following questioning by the judge, prosecutor, and defense counsel, two of the women and one of the men were excused by the trial court. The prosecutor used his first peremptory challenge against Prospective Juror 015052405, a Hispanic male. The defense made a *Batson*/*Wheeler* motion based on alleged racial bias, which was denied for failure to establish a prima facie case of discrimination. The peremptory challenges continued with defense counsel's removal of a male prospective juror. The prosecutor used his second peremptory challenge against a man, Prospective Juror 015521273. Defense counsel then challenged a female prospective juror.

The prospective jurors who had been excused or challenged were replaced by three men and four women. One of the men was excused by the trial court following a second round of questioning. The prosecutor's next three peremptory challenges were used against men: Prospective Jurors 015281795, 014984695, and 015100060. Defense counsel's next three peremptory challenges were all used against women.

In the third round of voir dire, the most recently excused and challenged venirepersons were replaced by six men and one woman. Three of the men were subsequently excused by the trial court. The prosecutor's sixth and seventh peremptory challenges were used against men: Prospective Jurors 015384851 and 015594584. Defense counsel elected to remove one woman and one man, in that order.

The individuals removed from the venire in the third round were replaced by two men and five women. After a fourth round of questioning, one woman was excused by the trial court and another woman was peremptorily challenged by the defense counsel. The prosecutor's eighth peremptory challenge was used against a man, Prospective Juror 015530014. Defendant made a *Batson/Wheeler* motion based on alleged gender bias.

The trial court found the People's removal of eight men and no women established a prima facie case of gender discrimination. The prosecutor then provided explanations for his strikes. Following each explanation, the trial court made a finding in favor of the People. In most instances, the judge merely said the reasons given were "sufficient." This excerpt from the record contains the final ruling on defendant's motion:

> "THE COURT: … So the motion's denied. I found a prima facie case, but I did find sufficient explanation for each challenge.
>
> "[PROSECUTOR]: Thank you, your Honor.
>
> "[DEFENSE COUNSEL]: Is the Court unwilling to hear further argument from defense?
>
> "THE COURT: I don't think I need to hear further argument from defense. It's up to the Court, as long as there's a statement made that's sufficient and proper explanations are given that are accepted, that's sufficient under the case law.
>
> "[DEFENSE COUNSEL]: Okay. I'm objecting to the incremental process of finding each challenge as being sufficient without considering the cumulative fact of eight challenges in a row without any challenges of female jurors, but I think that in essence would be my further comment.
>
> "THE COURT: Okay. All right. So we'll go ahead and let the jury start coming in."

4.

The proceedings resumed with three men and nine women occupying the first 12 seats in the jury box, and one man and two women as potential alternate jurors. Both sides refrained from using their ninth peremptory challenges. The parties stipulated to excusing one of the potential alternate jurors, leaving a man as the first alternate and a woman as the second alternate.

On the sixth day of trial, a male juror (Juror No. 33) was dismissed for failure to appear. He was replaced by the male alternate, Juror No. 37. Thus, the jury consisted of three men and nine women at all stages of trial.

### B.    Applicable Law

A *Batson*/*Wheeler* motion requests dismissal of the venire based on the alleged misuse of peremptory challenges. (See *People v. Yeoman* (2003) 31 Cal.4th 93, 115; *People v. Williams* (1997) 16 Cal.4th 635, 662, fn. 9.) "A prosecutor's use of peremptory challenges to strike prospective jurors on the basis of group bias—that is, bias against 'members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds'—violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community." (*People v. Avila* (2006) 38 Cal.4th 491, 541.) Peremptorily challenging a venireperson because of their gender is prohibited under state and federal law. (See *J. E. B. v. Alabama ex rel. T. B*. (1994) 511 U.S. 127, 129; *People v. Jurado* (2006) 38 Cal.4th 72, 104; *People v. Williams* (2000) 78 Cal.App.4th 1118, 1125 ["Peremptory challenges may not be used to exclude male jurors solely because of a presumed group bias"].)

Trial courts use a three-step procedure to evaluate *Batson*/*Wheeler* motions. "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial

5.

court must then decide … whether the opponent of the strike has proved purposeful racial discrimination.'" (*Johnson v. California* (2005) 545 U.S. 162, 168, fn. omitted.)

"Where, as here, the trial court ruled pursuant to the third stage of the analysis, we skip to that stage to examine whether the trial court properly credited the prosecutor's reasons for the challenges." (*People v. Miles* (2020) 9 Cal.5th 513, 539.) The standard of review "'is deferential, examining only whether substantial evidence supports its conclusions.'" (*Ibid.*) "'Usually, "the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy."'" (*People v. Smith* (2018) 4 Cal.5th 1134, 1147.)

"'[O]ne form of circumstantial evidence that is relevant, but not necessarily dispositive, on the issue of intentional discrimination' is a comparison of the treatment of an excused juror with other similarly situated jurors." (*People v. Smith*, *supra*, 4 Cal.5th at pp. 1147–1148, quoting *People v. Lenix* (2008) 44 Cal.4th 602, 622.) "'[E]vidence of comparative juror analysis must be considered … even for the first time on appeal if relied upon by the defendant [if] the record is adequate to permit the urged comparisons.' [Citation.] *But when, as here, a defendant 'wait[s] until appeal to argue comparative juror analysis,' our 'review is necessarily circumscribed,' and we 'need not consider responses by stricken panelists or seated jurors other than those identified by the defendant.*'" (*Smith*, at p. 1148, italics added, quoting *Lenix*, at pp. 622, 624; accord, *People v. Lomax* (2010) 49 Cal.4th 530, 572.)

"We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal." (*People v. Burgener* (2003) 29 Cal.4th 833, 864.)

## C.    Analysis

Defendant reasserts his trial counsel's argument "that the court failed to consider the cumulative fact that all eight of the prosecutor's challenges were of men." Put differently, he alleges the trial court "found each of the eight explanations individually 'sufficient' without considering them collectively to determine whether they were credible." Defendant relies on a federal appellate decision, *Coulter v. Gilmore* (7th Cir. 1998) 155 F.3d 912 (*Coulter*).

The *Coulter* case is distinguishable. There, a trial court had "relied on an unorthodox procedure for dealing with each side's use of its peremptory challenges." (*Coulter*, *supra*, 155 F.3d at p. 918.) "Instead of allowing each side to exercise its challenges until such time as an objection was raised, the trial judge simply stated that after it questioned each set of jurors, it would take a recess during which each side would compile a list of challenges. Each side would then be required to state on the record its legitimate reasons for each challenge. [¶] By adopting this procedure, the trial judge completely bypassed the stage at which the defendant objects to the state's use of its peremptory challenges and establishes his *prima facie* case of purposeful discrimination in a deliberate proceeding." (*Ibid.*)

In *Coulter*, "nine of the state's ten exercised peremptories were used to strike potential African-American jurors." (*Coulter*, *supra*, 155 F.3d at p. 914.) The defendant made three *Batson* motions, and each was denied "summarily and without analysis." (*Id.* at pp. 916, 921.) On the state's appeal from a federal district court's granting of habeas relief, the Seventh Circuit Court of Appeals concluded the evidence established a prima facie case of group bias (*id.* at pp. 918–919) and further held the trial court erred "by adhering to a procedure that precluded it—both as a systematic matter and in fact—from performing a 'similarly situated' analysis based on the 'totality of the circumstances'" (*id.* at p. 921). A comparative juror analysis showed "remarkable similarities between the excluded African-Americans and the non-excluded Caucasians." (*Id.* at p. 920.)

7.

Unlike in *Coulter*, the trial court below used the standard three-step procedure for resolving *Batson*/*Wheeler* motions. The court's consideration of the totality of the circumstances can be inferred from its finding of a prima facie case of gender bias. (See *People v. Scott* (2015) 61 Cal.4th 363, 383 ["the opponent of the strike must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose"].) Furthermore, a trial court is presumed to have known and followed the applicable law. (*People v. Bradford* (2010) 187 Cal.App.4th 1345, 1355; *People v. Castaneda* (1975) 52 Cal.App.3d 334, 342.)

"When the trial court has inquired into the basis for an excusal, and a nondiscriminatory explanation has been provided, we … assume the court understands, and carries out, its duty to subject the proffered reasons to sincere and reasoned analysis, *taking into account all the factors that bear on their credibility*." (*People v. Mai* (2013) 57 Cal.4th 986, 1049, fn. 26, italics added.) The denial of defendant's motion thus implies all necessary findings were made at the third stage of the *Batson*/*Wheeler* analysis. (*Ibid.*; see *People v. Jones* (2011) 51 Cal.4th 346, 360 ["The trial court denied defendant's motion, implicitly finding the prosecutor's explanation credible"]; *People v. Reynoso* (2003) 31 Cal.4th 903, 926 [acknowledging trial court's "implied finding" that prosecutor's explanations "were sincere and genuine"].) "When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings." (*People v. Silva* (2001) 25 Cal.4th 345, 386.) As we will discuss, the prosecutor's explanations were plausible and are supported by the record.

Defendant also focuses on the ultimate composition of his jury. Speaking in terms of the 12 original jurors and two alternates, he emphasizes "the fact that only 28.5% of the jurors selected were men." As we have noted, the final ratio of men to women was even lower because a male juror was replaced by the male alternate during trial.

There is no authority for the proposition "that statistical evidence about the underrepresentation of particular groups on a venire, or jury panel, can be sufficient to undermine a trial court's considered findings at the *third step* of a *Batson*/*Wheeler* analysis." (*People v. Winbush* (2017) 2 Cal.5th 402, 446.) "While statistical facts may retain some relevance at *Batson*'s third step as part of the universe of evidence bearing on the plausibility of asserted justifications for a strike [citation], no case has suggested such facts alone could be sufficient to establish pretext." (*Id.* at p. 447; accord, *People v. Smith*, *supra*, 4 Cal.5th at p. 1147 ["While still relevant, the statistical showing that motivated the finding of a prima facie case is not dispositive at this third stage"].) Moreover, the fact that only three of the 12 jurors were men is not as statistically significant as defendant would have us believe.

Scrutiny of the record reveals there were never more than five men occupying the first 12 seats in the jury box during voir dire. The original panel consisted of eight men and 10 women, but nine of the women were initially assigned to the first 12 seats. Had none of the original panel members been removed, the gender breakdown would have been the same as it was throughout the trial, i.e., three men and nine women.

The second round of challenges began with five men and seven women occupying the first 12 seats in the box. The third round began with only four men in those seats. Although six of the seven people added to the box in the third round were men, three of them were later excused by the trial court. Defense counsel used his seventh peremptory challenge against a man located in seat 4.

The final round of voir dire began with only three men in the first 12 seats. The prosecutor used his eighth peremptory challenge against a man located in seat 13—a seat subsequently occupied by the male alternate who later served on the jury. All of this is to say the underrepresentation of men on the jury was due to a multitude of circumstances. Also relevant is the prosecutor's acceptance of a panel with three male jurors and one

male alternate when he could have exercised more peremptory challenges.[1]  (See *People v. Johnson* (2015) 61 Cal.4th 734, 760 ["Although not conclusive, the fact that the jury included a member of the group allegedly discriminated against 'is an indication of good faith in exercising peremptories'"].)

Lastly, defendant argues comparative juror analyses show the prosecutor's explanations for his peremptory challenges were pretextual.  We will discuss those explanations in chronological order.  For the following reasons, we reject defendant's argument and conclude the *Batson*/*Wheeler* motion was appropriately denied.

### 1.     Prospective Juror 015052405

The prosecutor used his first peremptory challenge to remove Prospective Juror 015052405.  This panel member was a 36-year-old man who had immigrated to the United States from Mexico.  He had a ninth grade education and spoke English as a second language.  On his questionnaire, he answered "Yes" to a question asking if he had any difficulty "communicating or understanding" English.  During voir dire, he estimated his fluency was about "90 percent."

The prospective juror told the judge, "I understand mostly everything you say, but there is some words that I can still, you know, like trying to figure out or just learning at this time, you know.  And I personally don't think, you know, it's the moment to be learning anything."  The judge told him procedures could be implemented to explain things he did not understand.

The prosecutor asked, "Is there anyone here on the panel who would treat anything that a minor would say with some suspicion merely because they are under the age of 18?"  Despite posing the question to the entire group, he immediately engaged with a female panelist who taught kindergarten.  Afterward, Prospective Juror 015052405 raised

---

[1]When a defendant is charged with one or more offenses punishable by death or a life sentence, both the defendant and the People are statutorily entitled to 20 peremptory challenges. (Code Civ. Proc., § 231, subd. (a).)  In other felony cases, each side is entitled to 10 peremptory challenges.  (*Id.*, subds. (a), (b).)

his hand and said, "Yeah.  It might not be so related, but I had an experience whether trusting my son or whether trusting the school where my son was attending to."  He then told a story about how his son had been accused of stealing items from a classroom.

After listening to the story, the prosecutor asked, "Do you have any issues if you would be asked to judge the credibility of somebody who is under the age of 18?"  He replied, "It's like, you know, she said, the age difference will matter a lot."  It is unclear what Prospective Juror 015052405 meant in reference to what "she said" because none of the venirepersons had made any such remarks.

The prosecutor's explanation for removing Prospective Juror 015052405 was as follows:

> "[He] stated that, and from his questionnaire, that he had a ninth grade education, that English was his second language, that he understood approximately 90 percent of the words of the English language and that if during the trial, as he put it, big words were used—the Court invited him to try to write them down, pass them down, give them to the bailiff so that he could understand the words that were being used.  The People took that into consideration as well as the timeframe that that would take given the fact that we are going to be using rather large words when we're talking about jury instructions and what terms of art have a specific legal meaning.

> "In addition, your Honor, the People took into account the fact that [Prospective Juror 015052405] was going on at the end of his questions when I was asking him about the instance regarding his son and the alleged theft of what I picked up was either homework or materials of some kind from the school.  It was a little hard to understand, but I believe that he was stating that he automatically believed his son and that he went forward to the school, specifically viewing them as authority figures, essentially demanding to meet with the principal immediately and to have them prove the case against his son.  [¶] … [¶]

> "In addition, your Honor, he also talked about the fact that while he does speak Spanish is his primary language [*sic*], he did talk about the fact that there were translators who were going to be present and he did state for the record that he would be able to follow along with their translations as opposed to substituting his own.  Taking all of that into consideration, your Honor, were the reasons why I exercised the challenge."

A prospective juror's inability to fully comprehend the trial proceedings in English is a neutral and permissible reason for exercising a peremptory challenge. (See *People v. Jurado* (2006) 38 Cal.4th 72, 107 [stricken panelist "indicated that she had been born in the Philippines, thereby suggesting that English might not be her first language"]; *People v. Ayala* (2000) 24 Cal.4th 243, 266 [stricken panelist "struggled with English and did not understand the proceedings"].) Defendant concedes the prosecutor's explanations were facially valid and are supported by the record. However, he argues there was a notable similarity between Prospective Juror 015052405 and Juror No. 26. Focusing on Prospective Juror 015052405's story about his son, defendant argues Juror No. 26 "believed that her son was not guilty of the trespass of which he was accused … [y]et the prosecution did not excuse [her]." The comparison is extremely attenuated.

Juror No. 26 was a 74-year-old woman who had no difficulty speaking or understanding English. Her highest level of education was an associate's degree in "Art and Business." On her questionnaire, when asked if she or any family members had ever been charged with a crime, she indicated her 52-year-old son had once been charged with "trespass" but also said the case got dismissed.

The prosecutor asked Juror No. 26 about what she had written, and she explained: "He wasn't an adult at the time, but it was complicated. He's a complicated kid and he kept choosing odd things, doing wrong things. [¶] … [¶] So, yeah, he got in that situation." The prosecutor asked if anything about her son's experience "would make it difficult for [her] to be fair and impartial to either side." She answered, "No. He really wasn't guilty, but he—his choices kind of made people think that he would be. [¶] … [¶] It sounds crazy, but like I said, you had to be there."

The record shows no material similarities between Prospective Juror 015052405 and Juror No. 26. Therefore, a comparative juror analysis does not negate the substantial evidence supporting the trial court's ruling. The only evidence suggestive of gender bias is the fact the People's peremptory challenges were all used against men, but "such facts

12.

alone [are not enough] to establish pretext." (*People v. Winbush*, *supra*, 2 Cal.5th at p. 447.)

### 2. *Prospective Juror 015521273*

The prosecutor's second peremptory challenge was used against Prospective Juror 015521273. The 64-year-old man worked as a paralegal at a criminal defense firm. He expressed a favorable opinion of criminal defense attorneys on his questionnaire. He also claimed to know most of the judges at the trial court because his job required him to be there "every day."

The prospective juror's questionnaire indicated he and his family members had been victims of sexual abuse, but he never reported it to police because he "traveled a great deal and simply was too busy." His car had been vandalized "many times," which he did report to law enforcement. He also disclosed his own misdemeanor convictions for "prostitution" and a "bad check." The prosecutor cited the above information in his explanation for the peremptory challenge.

"Some neutral reasons for a challenge are sufficiently self-evident, if honestly held, such that they require little additional explication." (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1171.) Prospective Juror 015521273 stood apart from other panel members because of his profession and criminal history. The prosecutor's reasons for not wanting a criminal defense paralegal on the jury were obvious, valid, and gender neutral. (See *People v. Mai*, *supra*, 57 Cal.4th at p. 1053 ["The prosecutor's expressed reservation about having social workers on the jury" held permissible "insofar as it stemmed from a concern about the general attitudes and philosophies persons in that profession might harbor"].) Likewise, a prospective juror's own criminal history is a "fully legitimate and understandable reason for prosecutorial concern." (*People v. Harris* (2013) 57 Cal.4th 804, 877 (conc. opn. of Liu, J.), citing *People v. Lomax*, *supra*, 49 Cal.4th at p. 575.)

Defendant argues the prosecutor's explanation was pretextual because "there were questions of bias surrounding several of the sitting female jurors too." However, the

13.

potential biases disclosed by those jurors all tended to support the prosecution. Jurors Nos. 4, 5, and 34 had expressed uncertainty on their questionnaires regarding whether testimony about "explicit sexual acts" might affect their ability to remain impartial. Juror No. 40 (the female alternate), in response to a question about preconceptions, had written, "It's hard to not already think this person is guilty." Defendant also notes "jurors #31 and #40 indicated that they would tend to believe a psychologist solely because of his/her profession," but he fails to mention the only psychologist involved in the case was the People's CSAAS expert.

"In order for a comparison to be probative, jurors need not be identical in all respects [citation], but they must be materially similar in the respects significant to the prosecutor's stated basis for the challenge." (*People v. DeHoyos* (2013) 57 Cal.4th 79, 107.) Defendant observes that Prospective Juror 015521273 and some female jurors shared the unfortunate characteristic of having been victims of crime, including unspecified forms of sexual abuse or molestation. However, none of the women worked for criminal defense attorneys or had ever been prosecuted for breaking the law. Based on all relevant facts and circumstances, "we ultimately conclude that their respective responses were not so similar as to cast doubt on the trial court's acceptance of the prosecutor's reason for striking" Prospective Juror 015521273. (*People v. Miles*, *supra*, 9 Cal.5th at p. 555.)

### 3. Prospective Juror 015281795

The People's third peremptory challenge was used against a 24-year-old emergency medical technician (EMT). Defense counsel had pressed him about a questionnaire response arguably suggestive of negative opinions about criminal defense attorneys. The prosecutor's questions focused on his opinions about police officers.

On his questionnaire, Prospective Juror 015281795 claimed to have witnessed the crimes of "drug posse[ssi]on/Distribution/Identity Theft." His stepfather had been convicted of aiding and abetting an illegal marijuana growing operation, and his brother-

14.

in-law was serving a prison sentence for murder. In response to questions about whether he had been interviewed by police and how he felt about the experience, he wrote "Yes" and "Did not care for it." (Some capitalization omitted.)

Referencing the family members' convictions, the prosecutor asked the panelist, "Anything about that experience that makes it difficult to be fair and impartial especially if we have a law enforcement officer come to court and testify?" He replied, "I don't care too much for cops." The prosecutor said, "And why would that be?" He answered, "It's not because of that. I'm an EMT, and in almost every situation that the cops are doing something with[,] are involved, they sort of escalate the situation."

The trial court later posed a question to the entire panel: "Is there anyone who's going to either be—apply greater credibility to an officer's testimony or less credibility to an officer's testimony?" Prospective Juror 015281795 was the only person who raised a hand. Defendant claims the prospective juror "did not indicate which direction he was inclined to go." However, the following record excerpt indicates he was claiming a bias against police officers:

> "THE COURT: … All right. [Prospective Juror 015281795] raised his hand.
>
> "[PROSPECTIVE JUROR 015281795]: Yeah.
>
> "THE COURT: And we kind of talked about that a little bit before, right?
>
> "[PROSPECTIVE JUROR 015281795]: Yeah. Yeah.
>
> "THE COURT: I think you raised that before.
>
> "[PROSPECTIVE JUROR 015281795]: Yeah."

The prosecutor gave the following explanation for his peremptory challenge:

"[Prospective Juror 015281795] is the EMT who, I believe, said that officers escalate situations. I believe he was also the gentleman who was talking about didn't like either side. Give me one moment. I'm looking at his questionnaire. 24-year-old male. He was the one who was talking about officers escalating situations. He had been a victim of a crime before,

15.

drug possession or distribution, identity theft. He was talking about not caring for the experience of being interviewed by officers. He has a stepfather who went to prison for drug possession and distribution. His brother-in-law is currently in prison for murder."

After listening to the explanation, the trial court said, "So you think—negative interactions with law enforcement was your [basis]?" The prosecutor replied, "Aside from all the other ones I talked about, but yes."

The prosecutor's statements were slightly inaccurate. The prospective juror only claimed to have witnessed crimes; he denied ever being a victim of a crime. However, the prosecutor's explanation was given five days after he had removed Prospective Juror 015281795 from the panel. Also, the prosecutor went into the *Batson*/*Wheeler* hearing believing he needed only to explain his most recent peremptory challenge, i.e., the eighth one. He was obviously attempting to refresh his recollection with the questionnaire, and the victim/witness questions and answers were located on the same page. Given those circumstances, the discrepancy does not cause us to doubt the prosecutor's credibility. (See *People v. Baker* (2021) 10 Cal.5th 1044, 1076 ["A justification based on a mischaracterization of the record could reveal a discriminatory motive [citation], but might reflect a mere error of recollection [citations]"].)

Defendant argues several female jurors also claimed they or someone they knew had been victims of a crime. This is true, but the prosecutor's main reason for challenging Prospective Juror 015281795 was his negative opinions about police officers. Defendant's attempt to draw comparisons between the stricken panelist and Jurors Nos. 23 and 26 is not persuasive.

According to her questionnaire, Juror No. 23 was once interviewed by police as a witness to a crime. She wrote that the experience was "intimidating" and had made her feel "nervous." Nowhere in her questionnaire or voir dire responses did she express negative opinions about police officers or assumptions regarding their credibility. Juror No. 26 was the woman whose son had been charged with trespassing as a minor. Because she claimed her son was innocent, defendant assumes she had a negative view of

16.

law enforcement. However, she answered "No" when the prosecutor asked if anything about her son's experience might affect her ability to be impartial. Also, none of the female jurors raised a hand when the judge asked about preconceptions regarding the credibility of police officers.

Prospective Juror 015281795 was openly critical of police officers. The only panel members who expressed similar sentiments were Prospective Jurors 015550983 and 015100060. The former was excused by the trial court and the latter was removed via the People's fifth peremptory challenge (see, *post*). Therefore, a comparative juror analysis does not raise any doubts about the legitimacy of the prosecutor's explanation. (See *People v. Turner* (1994) 8 Cal.4th 137, 171 ["We have repeatedly upheld peremptory challenges made on the basis of a prospective juror's negative experience with law enforcement"].)

### 4. *Prospective Juror 014984695*

The People's fourth peremptory challenge was used against Prospective Juror 014984695, a 38-year-old "health services manager." On his questionnaire, he claimed to have been interviewed by police as a witness to a crime involving domestic violence. The question asked, "[H]ow did you feel about that experience?" He wrote: "Unpleasant, guns make me nervous[.] I'm a black American."

During voir dire, the panelist said he misunderstood the question. He had not witnessed a crime but was obligated to report suspicions of domestic violence as part of his job. When asked about the gun remark, he explained: "Well, in general, guns make me nervous. [¶] … [¶] Because they kill people. But in full disclosure, I tried to make a comment about race in the hopes that maybe I wouldn't be selected on the jury. So I know I shouldn't do that. [¶] … [¶] Had to pull the race card. I'm sorry."

The prosecutor's stated reason for challenging Prospective Juror 014984695 was because "he lied on the questionnaire and played the race card in order to get kicked." A panel member's stated or implied desire not to serve on the jury is "a permissible basis

17.

for excusal." (*People v. Woodruff* (2018) 5 Cal.5th 697, 749.) Defendant does not provide a comparative juror analysis for this peremptory challenge. Therefore, no additional discussion is required. (See *People v. Smith*, *supra*, 4 Cal.5th at p. 1148; *People v. Lomax*, *supra*, 49 Cal.4th at p. 572.)

### 5. *Prospective Juror 015100060*

The prosecutor used his fifth peremptory challenge to remove a 70-year-old man. This panel member had answered "Yes" on his questionnaire when asked about "specific problems" that might affect his concentration during trial. Sitting too long caused him knee and hip pain, which he attributed to arthritis and two knee replacements. His questionnaire vaguely indicated either he or someone close to him had once been the victim of a robbery. He also disclosed a personal criminal history of "reckless driving" and "resisting arrest."

During voir dire, the prosecutor asked the panel, "Does anybody have either any overwhelming positive or negative experience with law enforcement that you think we should know about?" Prospective Juror 015100060 raised his hand and claimed to have had "[an] experience with some Highway Patrol that were a little bit too aggressive." He added, "And, you know, that just stuck in my mind for close to 50 years." In response to a follow-up question, he opined the law enforcement officers had been prejudiced against him. The nature of the prejudice was not explained.

The prosecutor's stated reasons for the peremptory challenge were as follows:

"[Prospective Juror 015100060], 70-year-old male, retired dispatch operator. He talked about having knee and hip pain for sitting too long, both having knee replacements, and I believe that says arthritis. He talked about serving on a jury previously. He talked about being a possible victim of a 211 [robbery]. But the one that I focused in on the most was that he self-reported that he was convicted of reckless driving and resisting arrest. He characterized the CHP officers in that instance as being aggressive and possibly prejudiced against him. Those would be my reasons …."

Defendant's comparative analysis for Prospective Juror 015100060 is nearly identical to the one made with respect to the People's third peremptory challenge (see,

18.

*ante*, Prospective Juror 015281795).  Our reasons for rejecting the argument are also the same.  Defendant's only additional contention is Prospective Juror 015100060 and Juror No. 36 were alike because they both had medical issues (she had type 1 diabetes and was deaf in one ear).

Juror No. 36 identified her medical issues in response to questions specifically concerning medication and hearing or vision impairments.  Unlike Prospective Juror 015100060, she answered "No" to the question asking about problems that might affect one's ability to concentrate during trial.  Furthermore, the prosecutor's main reason for removing Prospective Juror 015100060 was his criminal history and negative experience with police.  Juror No. 36 had never been convicted of a crime, and two of her immediate family members were correctional officers.  So again, a comparative juror analysis does not call into question the reasons given for the peremptory challenge.  (See *People v. Turner*, *supra*, 8 Cal.4th at p. 171 ["We have repeatedly upheld peremptory challenges made on the basis of a prospective juror's negative experience with law enforcement"].)

### 6.    *Prospective Juror 015384851*

The People's sixth peremptory challenge was used against Prospective Juror 015384851.  The 23-year-old man was unemployed.  Like the previously stricken panelist, he had answered "Yes" to the question asking if any "specific problems" might affect his ability to concentrate during trial.  He wrote:  "I want to serve, [but] I have no money or income, I live far away."  The prosecutor's questioning of Prospective Juror 015384851 focused on the quoted statement.

The prospective juror estimated he lived 40 minutes from the courthouse and said, "I just don't have the money to make it here every day."  He added, in response to further questioning, "It would just distract me from the trial a lot.  Wouldn't make me unfair or impartial to anybody."

The prosecutor gave these reasons for his peremptory challenge:

"This is the gentleman who says that he lived far away, approximately 40 minutes, and that he did not have enough money to deal with that kind of

19.

travel. He's a 23-year-old male that's in a relationship. He is unemployed. I believe he stated that he was looking for a job at the time. He did talk about his ex being assaulted by her former boyfriend and that she reported it taking place years before that they were dating. He also talked about 'a kid I knew in high school [being] convicted for rape.[] Same for a teacher.['] He stated that both criminals were convicted. [¶] He is a victim of an ongoing hit-and-run case listed in number 21 [on the questionnaire]. He did talk about the—being interviewed by police as upsetting."

Defendant argues the prosecutor's explanation was pretextual because several female jurors claimed they and/or people close to them had been victims of a crime. He points to Jurors Nos. 4, 5, 23, 25, 26, and 31, but they all answered "No" to the question asking about problems that might affect their ability to concentrate during trial. Defendant also relies on Juror No. 40's concern about the impact of jury service on her job. She answered "Yes" to the question about problems affecting her ability to concentrate, but her voir dire responses are distinguishable from those of the stricken panelist.

Juror No. 40 described herself as a surgical nurse and wrote that "extended periods of time away [from work] will put my job in jeopardy." Defense counsel asked about this statement. She explained: "I'm a contract nurse, so I go to hospitals that don't have enough nurses …. So I took this week off of work knowing that I would at least have to show up for this part [jury selection]. Obviously they can't really do anything to me, but I'm putting them in a—in kind of a bad situation and they may not extend my contract now because of that …."

The exchange continued:

"[DEFENSE COUNSEL]: Okay. So as it relates to what you wrote and what you say, if you were selected is your job contract in jeopardy?

"[JUROR No. 40]: The contract that I'm in currently, obviously legally they can't do anything to me if I have proof that I'm here, but I'm kind of in negotiations to extend that contract where, you know, when you leave a unit with ten nurses that needs 12 to run, you kind of, you know.

"[DEFENSE COUNSEL]: Does that affect—

20.

"[JUROR No. 40]:  There's other jobs out there.  I'll be okay."

Based on Juror No. 40's remarks, the prosecutor may have believed there was less risk of her being distracted during trial than with Prospective Juror 015384851.  We also note Prospective Juror 015384851 was in seat 9 at the time of the peremptory challenge, which was used in the third round.  Juror No. 40 was the last person added to the box in round four and was sitting in seat 18.  The prosecutor may have been less concerned about Juror No. 40 due to the unlikelihood of her being among the 12 jurors who would decide the case (she ended up being the second alternate).  The prosecutor was never asked to explain why he did not use a peremptory challenge against Juror No. 40, so his reasoning is open to speculation.

"Two panelists might give a similar answer on a given point.  Yet the risk posed by one panelist might be offset by other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable.  These realities, and the complexity of human nature, make a formulaic comparison of isolated responses an exceptionally poor medium to overturn a trial court's factual finding."  (*People v. Lenix*, *supra*, 44 Cal.4th at p. 624.)

"When asked to engage in comparative juror analysis for the first time on appeal, a reviewing court need not, indeed, must not turn a blind eye to reasons the record discloses for not challenging other jurors even if those other jurors are similar in some respects to excused jurors."  (*People v. Jones*, *supra*, 51 Cal.4th at pp. 365–366; accord, *People v. Miles*, *supra*, 9 Cal.5th at p. 555.)  Some of Juror No. 40's questionnaire responses suggested predispositions favorable to the prosecution.  She had written, "It's hard to not already think this person is guilty."  She admitted an inclination to favor the testimony of psychologists based solely on their profession, which was relevant only to the testimony of the People's CSAAS expert.  Defendant highlights these responses in his comparative analyses of other stricken panelists but conveniently ignores them when comparing Juror No. 40 to Prospective Juror 015384851.

21.

"Defendants who wait until appeal to argue comparative juror analysis must be mindful that such evidence will be considered in view of the deference accorded the trial court's ultimate finding of no discriminatory intent." (*People v. Lenix*, *supra*, 44 Cal.4th at p. 624.) "This is so because a party legitimately may challenge one prospective juror but not another to whom the same particular concern applies." (*People v. Chism* (2014) 58 Cal.4th 1266, 1319.) For the reasons discussed, defendant has not carried his burden of demonstrating grounds for reversal.

### 7. *Prospective Juror 015594584*

The People's seventh peremptory challenge was used against a self-employed mechanic. The 21-year-old man was added to the jury box in the third round of voir dire and assigned to seat 12. The trial court welcomed the new panel members and said, "Okay. And without me even asking any questions, do you have anything you want to raise your hand and tell me?" Prospective Juror 015594584 was one of three people who raised a hand (none of whom served on the jury). His conversation with the judge was as follows:

"[PROSPECTIVE JUROR 015594584]: Since money was brought up, I am self-employed. I have no other employees, and I have jobs waiting in my shop right now and I've had to turn away probably six jobs.

"THE COURT: Okay. Yesterday I gave you two questionnaires.

"[PROSPECTIVE JUROR 015594584]: And I put that I was self-employed.

"THE COURT: You did?

"[PROSPECTIVE JUROR 015594584]: Yes.

"THE COURT: But you didn't say that—I think you checked, 'I can serve,' on your box.

"[PROSPECTIVE JUROR 015594584]: Well, I didn't know it was going—I've never done this before.

"THE COURT: Right. I understand.

22.

"[PROSPECTIVE JUROR 015594584]: I'm learning. I'll be honest.

"THE COURT: Most of these people are. So you're saying that it would be difficult for you?

"[PROSPECTIVE JUROR 015594584]: Yes."

Defense counsel asked Prospective Juror 015594584 to further explain his concerns. He answered, "Well, because I have no employees. I'm by myself, you know. So—and biggest problem is stuff that I'm having customers call me wanting their stuff done. [¶] … [¶] … I've only had my own business four months, so potentially being off for however long could—" Counsel apparently interrupted the last part of the statement and went on to ask, "Is there anything else that's causing you concern about your ability to be fair and open-minded in this case?" He replied, "Well, like I told—said before, this is my first time, so it's a learning process, but from today—yesterday to today a lot of people have said the kid situation is a thought that kind of—it's in the back of your head, you know."

The prosecutor did not ask Prospective Juror 015594584 any questions. He gave this explanation for the peremptory challenge: "Taking a look at his questionnaire, 21 years old, single, living at home with his parents. Stated that he had a mechanic business that he was losing money from said business, that he would not be able to focus solely in on the trial because of his thinking about the money that he would be losing. That would be the basis for kicking [Prospective Juror 015594584]."

A peremptory challenge may rest on the concern a prospective juror's "divided loyalties to jury service and career would impair his ability to give the former his full attention." (*People v. Clark* (2011) 52 Cal.4th 856, 908.) This was the prosecutor's stated reason for the challenge, and it is supported by the record. Defendant argues "[i]f the prosecutor was concerned about [the stricken panelist's] employment situation, it stands to reason that he would have been concerned about Juror #40's employment situation as well." However, even from a cold transcript, it is apparent Prospective Juror 015594584 was far more concerned than Juror No. 40 about how jury service might

23.

affect his livelihood. Defendant's comparative analysis argument for Prospective Juror 015594584 is the same as discussed in relation to the People's sixth peremptory challenge (see, *ante*, Prospective Juror 015384851), and we reject it for the same reasons.

### 8. *Prospective Juror 015530014*

The People's eighth peremptory challenge was used to remove an 18-year-old college student. This panelist reportedly had several cousins who worked in the criminal justice system, including a prosecutor and a defense lawyer. His questionnaire indicated another cousin had been incarcerated for "smuggling."

In a questionnaire response addressing whether he had formed any opinions about the case, Prospective Juror 015530014 wrote "yes I have." The prosecutor sought clarification during voir dire:

"[PROSECUTOR]: Okay. And are we talking about the opinion as to whether or not you'd like to serve or about an opinion as to [whether defendant] is guilty of the charges[?]

"[PROSPECTIVE JUROR 015530014]: I would say both.

"[PROSECUTOR]: Let's start with the first one.

"[PROSPECTIVE JUROR 015530014]: I don't want to be here.

"[PROSECUTOR]: Why not[?]

"[PROSPECTIVE JUROR 015530014]: Because I already missed four days of school.

"[PROSECUTOR]: I can pretty much guess everybody out there and everybody here doesn't want to be here either so is this something where your exams or grades are going to have an issue[?]

"[PROSPECTIVE JUROR 015530014]: Yes. I have a [trigonometry] test coming up and I got to write a speech for a class and possibly do an 8 to 10 page paper.

"[PROSECUTOR]: Okay. Did you ever try to postpone your jury service?

"[PROSPECTIVE JUROR 015530014]:  Yes, but I would rather just get it done, over with.

"[PROSECUTOR]:  And the issue regarding forming an opinion as to [defendant], you've had the definition explained to you ad nauseam, I'm sure, you've been instructed as he sits here today he's presumed to be not guilty; you have a problem with that?

"[PROSPECTIVE JUROR 015530014]:  No, I don't.

"[PROSECUTOR]:  You don't?

"[PROSPECTIVE JUROR 015530014]:  No.

"[PROSECUTOR]:  Do you?

"[PROSPECTIVE JUROR 015530014]:  I just don't like the case and what was brought to it.

"[PROSECUTOR]:  Okay.  No one likes to sit on a sexual assault case, I understand that.  So is this something where you feel you cannot be fair and impartial because of the type of case that it is?

"[PROSPECTIVE JUROR 015530014]:  Yes.

"[PROSECUTOR]:  Okay.  Even though both the judge and myself and [defense counsel] are telling you you have to hear all the evidence, apply the presumption of innocence and beyond a reasonable doubt you still can't be fair and impartial?

"[PROSPECTIVE JUROR 015530014]:  I could reason with it, do it, but I wouldn't want to really.  I will do it if I have to."

When explaining his peremptory challenge, the prosecutor acknowledged Prospective Juror 015530014's biases "tended to favor [the People's] side of the case." Nevertheless, the prosecutor cited the young man's preconceived opinions as one of the main reasons for the strike.

"A party does not offend *Batson* or *Wheeler* when it excuses prospective jurors who have shown orally or in writing, or through their conduct in court, that they personally harbor biased views." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1016.)  Defendant argues the prosecutor's explanation was pretextual because "there were questions of bias surrounding several of the sitting female jurors too."  It is the same

25.

argument he made in relation to the People's second peremptory challenge. Once again, there are significant distinctions.

For example, Jurors Nos. 4, 5, and 34 expressed uncertainty on their questionnaires about whether testimony describing "explicit sexual acts" might affect their ability to remain impartial. In contrast to those equivocal responses, Prospective Juror 015530014 said he did not believe he could be impartial. He further expressed negative feelings about the presumption of innocence and reasonable doubt standard, making clear his adherence to those principles would be done begrudgingly.

Defendant's opening brief does not address the prosecutor's other reason for striking Prospective Juror 015530014, i.e., his open aversion to jury service due to its interference with his studies. In his reply brief, defendant argues "Juror #40 indicated on the questionnaire that extended periods away from her job would put her job in jeopardy." This comparison to the female alternate is valid but unpersuasive.

As discussed, Juror No. 40 wrote on her questionnaire, "It's hard to not already think this person is guilty." Her statement was not quite the same as Prospective Juror 015530014 saying he did not believe he could be fair and impartial. Moreover, defense counsel questioned Juror No. 40 about what she had written, and she expressed a willingness to be fair and a belief in her ability not to prejudge defendant.

Although Prospective Juror 015530014 and Juror No. 40 were both reluctant to serve as jurors, their attitudes were completely different. Despite concerns about her contract not being extended, Juror No. 40 said, "There's other jobs out there. I'll be okay." She also said the issue would not affect her ability to be "a fair, open-minded juror." Prospective Juror 015530014 told the prosecutor, "I don't want to be here." He complained about having already missed four days of school and doubted his ability to be fair and impartial.

To reiterate, "a party legitimately may challenge one prospective juror but not another to whom the same particular concern applies." (*People v. Chism*, *supra*, 58

Cal.4th at p. 1319.)  Although the stricken panelist's biases may have been against defendant, the record supports the prosecutor's stated reasons for not wanting him on the jury.  (See, e.g., *People v. Woodruff*, *supra*, 5 Cal.5th at pp. 749–752 [peremptory challenge may be based on panelist's attitude toward jury service]; cf. *People v. Hensley* (2014) 59 Cal.4th 788, 803 ["Rigid jurors who appear emotionally detached and terse may be divisive during deliberations.  They may not perform well as open-minded jurors willing and able to articulate their views and persuade others"].)  The comparative juror analysis does not compel reversal of the trial court's ruling.

## II.    Ineffective Assistance of Counsel Claim

Defendant alleges ineffective assistance of counsel based on his trial attorney's failure to request an instruction concerning eyewitness identification, i.e., CALCRIM No. 315.  Defendant must establish (1) the attorney's performance fell below an objective standard of reasonableness and (2) prejudice occurred as a result.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Anderson* (2001) 25 Cal.4th 543, 569.)  The claim fails under both prongs of the *Strickland* test.

### A.    Additional Background

Defendant married the mother of victim 1 in 2004, a few weeks prior to victim 1's third birthday.  From approximately 2004 through October 2008, victim 1 lived in a three-bedroom house (the first house) with seven other people:  her mother, three brothers, an older sister, her sister's daughter (victim 2),[2] and defendant.  Defendant's brother and one of his friends resided at the same address, but they lived and slept in a detached garage.

In approximately November 2008, the family moved to a different home (the second house).  In 2010, the mother divorced defendant.  In 2016, victims 1 and 2 came forward with allegations defendant had sexually abused them years earlier.

---

[2]Victims 1 and 2 are close in age.  Although victim 2 is victim 1's niece, victim 2 is older by almost two years.

Counts 1 and 2 were based on allegations of defendant molesting victim 1 in 2008 when the family was living in the first house. She would have been six years old at the time. The incidents were alleged to have occurred on summer nights when victim 1, her brothers, and victim 2 were sleeping on the hallway floor near an air conditioning unit. According to victim 1's testimony, defendant sometimes came into the hallway and laid down next to her. He would then "stick[] his hand down [her] pants" and touch her genitalia.

Victim 1 pretended to be asleep when defendant molested her. She gave conflicting testimony about whether she had kept her eyes closed the entire time. However, she claimed to have known it was defendant because of his size ("he was bigger than anybody else") and because she had heard him approaching from the bedroom he shared with her mother ("the sound of the door was very loud, so I could tell, like, the difference, [from] other doors"). Defendant was found guilty on both counts.

Counts 3–6 were based on alleged incidents at the second house in 2008 and/or 2009 when victim 1 was seven years old. She testified defendant had lured her into different rooms of the house ("[a]nywhere where there was nobody else") by giving her candy. When they were alone, defendant committed alleged acts of sexual abuse involving digital penetration (counts 3 & 4) and oral copulation (counts 5 & 6).

Although victim 1 had alleged digital penetration when reporting the incidents to police, at trial she could not recall whether defendant performed those specific acts (as opposed to only rubbing her genitalia). The jury found defendant not guilty on both charges of digital penetration. He was convicted on the first count of oral copulation (count 5) but acquitted on the second count (count 6).

**B.    Law and Analysis**

Defendant's claim relates to the verdicts on counts 1 and 2, i.e., the incidents at the first house when he laid down next to victim 1 in the hallway and stuck his hand down her pants. He argues the jury might have concluded someone else committed those

crimes if an instruction had been given pursuant to CALCRIM No. 315.  The pattern instruction reads:

"You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony.

"In evaluating identification testimony, consider the following questions:

"•Did the witness know or have contact with the defendant before the event?

"•How well could the witness see the perpetrator?

"•What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance, [and] duration of observation[, and _____ <insert any other relevant circumstances>]?

"•How closely was the witness paying attention?

"•Was the witness under stress when he or she made the observation?

"•Did the witness give a description and how does that description compare to the defendant?

"•How much time passed between the event and the time when the witness identified the defendant?

"•Was the witness asked to pick the perpetrator out of a group?

"•Did the witness ever fail to identify the defendant?

"•Did the witness ever change his or her mind about the identification?

"•How certain was the witness when he or she made an identification?

"•Are the witness and the defendant of different races?

"•[Was the witness able to identify other participants in the crime?]

"•[Was the witness able to identify the defendant in a photographic or physical lineup?]

"•[_____ *<insert other relevant factors raised by the evidence>*.]

"•Were there any other circumstances affecting the witness's ability to make an accurate identification?

"The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime.  If the People have not met this burden, you must find the defendant not guilty."

"On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.  All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding."  (*People v. Mai*, *supra*, 57 Cal.4th at p. 1009.)  In short, "the conviction must be affirmed unless there could be no conceivable reasonable purpose for counsel's omission."  (*People v. Padilla* (2002) 98 Cal.App.4th 127, 136.)

A trial court has no sua sponte duty to instruct jurors on the evaluation of eyewitness identification testimony.  (*People v. Alcala* (1992) 4 Cal.4th 742, 802–803.)  Like its CALJIC counterpart, CALCRIM No. 315 is a pinpoint instruction designed for use when a perpetrator's identity is in dispute.  (See *People v. Reed* (2018) 4 Cal.5th 989, 1009 [discussing CALJIC No. 2.92]; Commentary to CALCRIM No. 315 ["The court should give the unbracketed factors, if requested, in every case in which identity is disputed"].)  The instruction is worded in a manner that presumes the charged offense was committed (e.g., "The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime").

In a pinpoint instruction, "[w]hat is pinpointed is not specific evidence as such, but the *theory* of the defendant's case."  (*People v. Adrian* (1982) 135 Cal.App.3d 335, 338; accord, *People v. Wright* (1988) 45 Cal.3d 1126, 1137.)  As the People correctly observe, defendant did not argue third party culpability or mistaken identity at trial.  The defense

theory was that victims 1 and 2 were not abused and their allegations had been fabricated for various reasons.

On the question of deficient performance, "we begin with the presumption that counsel's actions fall within the broad range of reasonableness, and afford 'great deference to counsel's tactical decisions.'" (*People v. Mickel* (2016) 2 Cal.5th 181, 198.) As reflected in defendant's trial brief, CALCRIM No. 315 was included in defense counsel's original list of requested jury instructions. Before the close of evidence, counsel told the trial court, "I made my initial jury instruction request list as part of my defense trial brief and I've withdrawn several of the requests on that list as they do not appear necessary." This is a strong indication that the omission of CALCRIM No. 315 was a reasoned decision as opposed to an inadvertent mistake.

One plausible explanation for counsel's decision is the possibility CALCRIM No. 315 would detract from, or be perceived as conflicting with, the defense theory of the case. "The instruction cuts two ways. While it may be of benefit to a defendant in a particular case, so may it enhance the prosecution's argument in another." (*People v. Sanchez* (1990) 221 Cal.App.3d 74, 77 [discussing CALJIC No. 2.92].) From a tactical standpoint, the defense may not want "to call to the jury's attention the very factors a prosecutor thinks are the strong points of the state's case." (*Ibid.*)

"Failure to argue an alternative theory is not objectively unreasonable as a matter of law." (*People v. Thomas* (1992) 2 Cal.4th 489, 531.) A third party culpability theory, which is necessarily implied by CALCRIM No. 315, would have posited that victim 1 truthfully testified about being molested in the first house and was mistaken as to the identity of the perpetrator, but then lied about being sexually assaulted in the second house. The only other people who slept in the first house were the victim's mother, siblings, and niece, which makes the mistaken identity theory even more farfetched.

Assuming defendant could establish deficient performance, the error would be harmless for essentially the same reasons. Again, the defense did not rely on a mistaken

identity theory.  Doing so would have effectively implied the perpetrator was one of the victim's siblings or one of the people who lived in the detached garage.  Such accusations were not made or insinuated.  One of the men who had lived in the garage testified on defendant's behalf as a character witness.

Victim 1 expressed no uncertainty regarding the identity of the perpetrator. Despite conflicting testimony as to whether she had looked at him during the offenses, she knew it was defendant based on his size and from hearing him come out of her mother's bedroom.  With no evidence or argument suggesting the involvement of a third party, it is not reasonably probable the verdicts on counts 1 and 2 would have been different had CALCRIM No. 315 been requested and given.  (See *Strickland v. Washington*, *supra*, 466 U.S. at p. 694 ["The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"].)

### C.    Alleged Instructional Errors

#### 1.    CALCRIM No. 226

Defendant alleges the trial court breached a sua sponte duty to instruct on factors relevant to a witness's credibility.  More specifically, he claims the trial court erred by omitting essential portions of CALCRIM No. 226.[3]  The argument is based on the

---

[3]The nonoptional language of CALCRIM No. 226 provides:

"You alone must judge the credibility or believability of the witnesses.  In deciding whether testimony is true and accurate, use your common sense and experience.  You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have.

"You may believe all, part, or none of any witness's testimony.  Consider the testimony of each witness and decide how much of it you believe.

"In evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony.  Among the factors that you may consider are:

"•How well could the witness see, hear, or otherwise perceive the things about which the witness testified?

absence of the following language from the version of CALCRIM No. 226 recited in the oral instructions given prior to closing arguments and the written CALCRIM No. 226 instruction provided to the jury:

> "•How well could the witness see, hear, or otherwise perceive the things about which the witness testified?
>
> "•How well was the witness able to remember and describe what happened?
>
> "•What was the witness's behavior while testifying?
>
> "•Did the witness understand the questions and answer them directly?"

The People concede the assertion of error but argue it was harmless. We do not accept the concession. Both parties fail to realize the quoted language was in fact provided to the jury, both orally and in writing.

"We review de novo a claim that the trial court failed to properly instruct the jury on the applicable principles of law." (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 850.) CALCRIM No. 105 ["Witnesses"], which is intended to be used at the beginning of trial, is identical to CALCRIM No. 226 ["Witnesses"]. The trial court recited all

---

"•How well was the witness able to remember and describe what happened?

"•What was the witness's behavior while testifying?

"•Did the witness understand the questions and answer them directly?

"•Was the witness's testimony influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided?

"•What was the witness's attitude about the case or about testifying?

"•Did the witness make a statement in the past that is consistent or inconsistent with his or her testimony?

"•How reasonable is the testimony when you consider all the other evidence in the case?

"Do not automatically reject testimony just because of inconsistencies or conflicts. Consider whether the differences are important or not. People sometimes honestly forget things or make mistakes about what they remember. Also, two people may witness the same event yet see or hear it differently."

33.

nonoptional language in CALCRIM Nos. 105 and 226 in its instructions to the jury prior to the parties' opening statements.

The trial court omitted part of CALCRIM No. 226 from its oral instructions following the close of evidence and from the written version of CALCRIM No. 226 given to the jury. The People speculate this was due to a clerical error in the preparation of the written instructions. Regardless, the written instructions did include a complete version of CALCRIM No. 105. At the risk of belaboring the point, we emphasize CALCRIM Nos. 105 and 226 are *identical*.

"Section 1093, subdivision (f), permits the trial court to instruct '[a]t the beginning of the trial or from time to time during the trial ….' It does not require a rereading of all instructions at the conclusion of trial." (*People v. Frederick* (2006) 142 Cal.App.4th 400, 415.) "As long as the trial court has correctly instructed the jury on all matters pertinent to the case, there is no error. The failure to give an instruction on an essential issue, or the giving of erroneous instructions, may be cured if the essential material is covered by other correct instructions properly given." (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 277.)

Defendant alternatively claims ineffective assistance of counsel, but he mistakenly contends the trial court failed to instruct "on all of the factors listed in CALCRIM 226 that [were] applicable to the case." Were we to assume his trial counsel was negligent in failing to object to the incomplete reading of CALCRIM No. 226 prior to closing arguments, the claim would fail for lack of prejudice.

"Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions." (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) "'The fact that the necessary elements of a jury charge are to be found in two instructions rather than in one instruction does not, in itself, make the charge prejudicial.' [Citation.] 'The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole.' [Citation.]" (*People*

34.

*v. Burgener* (1986) 41 Cal.3d 505, 538–539; see *People v. Whisenhunt* (2008) 44 Cal.4th 174, 220 ["[I]n assessing a claim of instructional error, we consider the entire charge to the jury, and not simply the asserted deficiencies in the challenged instruction"].)

### 2. CALCRIM No. 207

Counts 12 and 13, which involved victim 2, alleged violations of section 288.7, subdivision (b), "[o]n or about March 9, 2010 through March 9, 2011." Victim 2 was born March 9, 2000. Therefore, victim 2 was between the ages of 10 and 11 years old at the time of the alleged offenses.

The charges at issue required proof of "oral copulation or sexual penetration, as defined in Section 289, with a child who [was] 10 years of age or younger." (§ 288.7, subd. (b).) The phrase "10 years of age or younger" has been interpreted to mean "under 11 years of age." (*People v. Cornett* (2012) 53 Cal.4th 1261, 1264.) It was the People's burden to show defendant committed the alleged acts (digital penetration) against victim 2 prior to her 11th birthday. (*Ibid.*) Therefore, the date range alleged in the information and related jury instructions should have been through March 8, 2011. If defendant committed the alleged acts on or after March 9, 2011, he was not guilty as a matter of law.

The jury was instructed pursuant to CALCRIM No. 207 as follows: "It is alleged that the crimes [charged in counts 1–13] occurred from on or about November 12, 2007 to March 9, 2011. The People are not required to prove that the crime took place exactly on those days but only that it happened reasonably close to those days." Defendant argues this instruction was erroneous and potentially misleading as to counts 12 and 13 because it suggested he could be convicted for acts committed on or shortly after victim 2's 11th birthday. We agree, but we also conclude the error was harmless beyond a reasonable doubt. (See *People v. Lewis* (2006) 139 Cal.App.4th 874, 884 ["To the extent the error implicates federal constitutional rights, our inquiry is governed by the harmless error standard expressed in *Chapman v. California* (1967) 386 U.S. 18"].)

"In assessing a claim of instructional error or ambiguity, we consider the instructions as a whole to determine whether there is a reasonable likelihood the jury was misled." (*People v. Tate* (2010) 49 Cal.4th 635, 696.) We also consider the evidence and the arguments of counsel. (*People v. Huggins* (2006) 38 Cal.4th 175, 193; *People v. Jaspar* (2002) 98 Cal.App.4th 99, 111; *People v. Dieguez*, *supra*, 89 Cal.App.4th at p. 276.) An instructional error will be deemed harmless if it was "unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." (*Yates v. Evatt* (1991) 500 U.S. 391, 403; accord, *People v. Brooks* (2017) 3 Cal.5th 1, 71.)

The jury was instructed pursuant to CALCRIM No. 1128, which identified the elements of section 288.7, subdivision (b), and twice stated the 10 years of age or younger requirement. Defendant astutely observes this instruction was also flawed because it referenced "Counts 3, 4, 5, 6, 11 and 12," when it should have said "counts 3, 4, 5, 6, 12, and 13."[4] However, the "10 years of age or younger" language was repeated with correct references to counts 12 and 13 in instructions given pursuant to CALCRIM Nos. 252, 1191B, and 3500.

The prosecutor repeatedly discussed the age requirement during closing argument, including in relation to count 13. Defense counsel did not discuss the statutory elements in his closing argument or suggest any alleged acts had occurred on or after victim 2's 11th birthday, which was consistent with the defense theory of the accusations being false. The verdict forms for counts 12 and 13 each described the charged offense as "a felony violation of section 288.7(b) …, oral copulation or sexual penetration with a child 10 years of age or under, as charged in … the Information filed herein." (Some capitalization omitted.) The date range of March 9, 2010, through March 9, 2011, was not included on the verdict forms.

---

[4]Defendant further notes the instruction did not contain the following optional language, which apparently neither side requested: "Under the law, a person becomes one year older as soon as the first minute of his or her birthday has begun." (CALCRIM No. 1128.)

Defendant argues "the problem was not that the jurors were unaware of the 'ten years of age or younger' element.  The problem, rather, was that the jurors were incorrectly led to believe that they did not need to follow it strictly."  He contends "one cannot rule out beyond a reasonable doubt the following scenario:  that the jurors concluded that the two acts of digital penetration occurred after March 8, 2011, but they still found him guilty of the charges under counts 12 and 13 because the acts occurred 'reasonably close' to March 8, 2011."

The jury's verdicts establish its belief that defendant sexually abused victim 2 sometime between March 2010 and March 2011.  Defendant argues the jury may have concluded the offenses were committed on or after her 11th birthday because "the most [victim 2] could say about the timing of the two incidents was to confirm that they occurred when she was 'around ten years old.'"  He is relying on only one part of the victim's testimony and fails to acknowledge the context; the prosecutor was trying to distinguish between incidents from when she was nine years old, which formed the basis for counts 7–9.  Defendant also ignores critical testimony at the end of the prosecutor's direct examination:

> "[PROSECUTOR:]  Just to be clear, … the incidents we've been talking about, were you at least ten years or younger?
>
> "[VICTIM 2:]  Yes."

The prosecutor's closing argument included these statements about counts 12 and 13:  "Now, for element two it also says [victim 2] was ten years of age or younger.  The fact that she is ten years old means that she still qualifies for this particular element.  Just because she's turned ten doesn't mean that it doesn't qualify.  And I made sure to ask her during her testimony.  She stated that the incident she was talking about occurred when she was ten years of age."

37.

Furthermore, as the People argue in their briefing, all evidence indicated victim 1's mother divorced defendant in 2010. The mother was asked about the timeline on direct examination:

"Q. Around what time period did you get a divorce from [defendant]?

"A. 2010, 14. I'm not sure if I have the dates right. But June 2010.

"Q. And did [defendant] immediately leave the home after June of 2010?

"A. Yes.

"Q. Sorry. Did he immediately leave the home after the time period of June 2010?

"A. Yes, but he came back about two times."

The mother had told the police defendant did not move out until October 2010, and the prosecutor asked about the discrepancy.[5] She testified: "I do remember saying October 2010, but I don't remember if I said that he returned about two times …. [¶] … [¶] [H]e left the house after October 2010—excuse me—June 2010, and then he came back a couple of times as a visitor or visiting." The mother further explained defendant moved out in June 2010 and the divorce became final in October 2010.

Multiple witnesses, including the mother, testified the family moved into the second house in late October or early November 2008. On cross-examination, the mother testified defendant lived there for "about two years." Victim 2 also testified the divorce occurred in 2010 and defendant moved out the same year. If defendant moved out in October 2010, victim 2 would have been approximately 10.6 years old when he departed. In other words, her 11th birthday was still four months away. The testimony about defendant moving out in 2010 was uncontroverted, and no evidence suggested he continued abusing victim 2 after leaving the home.

---

[5]The investigating officer testified the mother had said the divorce was finalized in May or June of 2010 but defendant did not move out until October of that year.

The jury found defendant guilty on all seven counts involving victim 2, thus indicating it found her testimony credible. In essence, defendant claims the jury may have (1) rejected the victim's testimony about being 10 years old or younger during the relevant time period, (2) concluded the incidents of digital penetration occurred on or after March 9, 2011, and (3) convicted defendant even though it was aware of the age requirement for the offenses—all in spite of the fact there was no evidence of any charged conduct occurring after 2010. This theory of prejudice amounts to fanciful speculation. As such, we conclude the instructional error was harmless beyond a reasonable doubt.

## III. Section 654

Counts 12 and 13 each carried a mandatory prison sentence of 15 years to life. (§ 288.7, subd. (b).) Counts 1, 2, 5, 7, 8, 9, 10, and 11 would have been punishable by terms of six to eight years (§ 288, subd. (a)), but the multiple victim finding required an alternate penalty of 15 years to life (§ 667.61, subds. (b), (c)(4), (e)(4)). Accordingly, the trial court imposed an aggregate sentence of 150 years to life.

Based on victim 2's testimony and the prosecutor's closing argument, defendant contends his convictions for digital penetration under counts 12 and 13 were based on the same conduct involved in counts 10 and 11 (described in the information as "rubbing of the vagina"). For that reason, he claims punishment should have been stayed on two of those counts pursuant to section 654. The People concede the factual basis for defendant's claim but dispute the applicability of section 654.

Section 654 prohibits multiple punishment for crimes arising out of a single act or indivisible course of conduct. (*Id.*, subd. (a); *People v. Hester* (2000) 22 Cal.4th 290, 294.) The defendant's intention(s) and objective(s) determine whether two crimes are part of an indivisible course of conduct. (*People v. Harrison* (1989) 48 Cal.3d 321, 335.) In the absence of separate and distinct objectives, a trial court errs by imposing consecutive or concurrent sentences instead of staying the execution of sentence for the

39.

counts to which section 654 applies. Such errors are reviewable even if, as here, no objection was made at the time of sentencing. (*People v. Brents* (2012) 53 Cal.4th 599, 618.)

"Facts relevant to sentencing need be proved only by a preponderance of the evidence." (*People v. Towne* (2008) 44 Cal.4th 63, 86; see *People v. Cleveland* (2001) 87 Cal.App.4th 263, 268–270.) "When a trial court sentences a defendant to separate terms without making an express finding the defendant entertained separate objectives, the trial court is deemed to have made an implied finding each offense had a separate objective." (*People v. Islas* (2012) 210 Cal.App.4th 116, 129.) "We review the court's determination … for sufficient evidence in a light most favorable to the judgment, and presume in support of the court's conclusion the existence of every fact the trier of fact could reasonably deduce from the evidence." (*Cleveland*, *supra*, at p. 271.)

Section 654 is often inapplicable to convictions for sex crimes committed on a single occasion. (*People v. Scott* (1994) 9 Cal.4th 331, 344, fn. 6.) The seminal case in this area is *People v. Perez* (1979) 23 Cal.3d 545. There, a defendant had committed acts of digital penetration, sexual penetration, oral copulation, and sodomy against one victim over a period of 45 minutes to an hour. (*Id*. at p. 549.) The trial court stayed punishment for the oral copulation and sodomy convictions. The California Supreme Court overturned the stay, rejecting the argument the defendant had committed the crimes with a lone objective of sexual gratification. (*Id*. at p. 552.)

The *Perez* opinion states, "A defendant who attempts to achieve sexual gratification by committing a number of base criminal acts on his victim is substantially more culpable than a defendant who commits only one such act. We therefore decline to extend the single intent and objective test of section 654 beyond its purpose to preclude punishment for each such act." (*People v. Perez*, *supra*, 23 Cal.3d at p. 553.) Under the holding of *Perez*, section 654 is not applicable to sex crimes involving "separate and distinct" acts, even if those acts "were closely connected in time and a part of the same

40.

criminal venture." (*Perez*, at p. 553.) However, section 654 *does* apply if one of multiple sex offenses "was committed as a means of committing any other, … facilitated commission of any other, [or] was incidental to the commission of any other." (*Perez*, at pp. 553–554.)

Both parties rely on *People v. Alvarez* (2009) 178 Cal.App.4th 999. That opinion holds "section 654 does not apply to sexual misconduct that is 'preparatory' in the general sense that it is designed to sexually arouse the perpetrator or the victim." (*Id*. at p. 1006.) The People contend "the trial court could have reasonably concluded that [defendant]'s acts of rubbing [victim 2's] vagina for several minutes was 'preparatory' to inserting his finger inside her vagina either for his or for [her] sexual gratification."

There are problems with the People's argument. As they acknowledge elsewhere in their brief, the victim's time estimate for the "rubbing" was given in testimony about incidents that occurred in her grandmother's bedroom when she was nine years old. Counts 10–13 were based on two separate incidents in different locations when the victim was 10 years old.

The testimony regarding counts 10–13 was very brief and generalized. Victim 2 described slight digital penetration by "the very tips" of defendant's fingers. The prosecutor asked her, "The times when he would put the tips of his fingers into your vagina, would he necessarily start touching first and then using his fingers?" She responded affirmatively, but none of her testimony provided a temporal distinction between the rubbing of her genitalia and the digital penetration.

The *Alvarez* case is distinguishable on its facts. There, section 654 was held inapplicable to three section 288 convictions based on the appellant's kissing of a nine-year-old victim, digital penetration of her, and "forc[ing] her to fondle his penis." (*People v. Alvarez*, *supra*, 178 Cal.App.4th at pp. 1006–1007.) The appellate record was "entirely susceptible of the interpretation that appellant kissed [the victim] for the purpose of his own arousal and that, in so doing, he was not facilitating any other form of

sexual contact …. Each lewd act was separate and distinct, and none of the acts were necessary to accomplish the others." (*Id*. at p. 1007; see *id*. at p 1006, citing *People v. Perez*, *supra*, 23 Cal.3d at p. 553 ["section 654 will not apply unless the crimes were either incidental to or the means by which another crime was accomplished"].)

The record in this case does not contain substantial evidence of separate and distinct acts. The victim's limited testimony was insufficient to show defendant's lewd touching was not the means by which he committed the digital penetration, did not facilitate the digital penetration, and/or was not incidental to the digital penetration. (See *People v. Perez*, *supra*, 23 Cal.3d at pp. 553–554; *People v. Alvarez*, *supra*, 178 Cal.App.4th at p. 1006.) Therefore, the punishment imposed on counts 10 and 11 must be stayed.[6]

## DISPOSITION

The judgment is modified to stay, under section 654, subdivision (a), the sentence imposed on counts 10 and 11. As so modified, the judgment is affirmed. The superior court is directed to prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.

PEÑA, J.

WE CONCUR:


HILL, P.J.


DE SANTOS, J.

---

[6]Defendant agrees with the People's alternative position that section 654 should be applied to counts 10–11 and not 12–13. (See *People v. Thompson* (1989) 209 Cal.App.3d 1075, 1080.)